UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FELICIA CROSS,<br><br>　　　　　　　Plaintiff,<br><br>　　　　v.<br><br>SEATTLE CANCER CARE ALLIANCE/ FRED HUTCHINSON CANCER RESEARCH CENTER, a Washington nonprofit corporation,<br><br>　　　　　　　Defendant. | No.<br><br>PLAINTIFF'S COMPLAINT<br><br>(JURY TRIAL DEMANDED) |

# COMPLAINT

1.　　Plaintiff, *Felicia Cross,* brings these causes of action against Defendant, *Seattle Cancer Care Alliance/ Fred Hutchinson Cancer Research Center,* under 31U.S.C. 3729, et seq., the False Claims Act, for unlawfully and intentionally retaliating against *Cross,* in violation of the anti-retaliation provisions, of the False Claims Act, 31 U.S.C. 3730(h). *Cross* engaged in investigation and information gathering, about possible Medicare fraud (a protected activity under the FCA), and the Defendant, with knowledge of such conduct, retaliated, by

PLAINTIFF'S COMPLAINT- 1

wrongfully terminating *Cross'* employment, because she engaged in such activity.

## INTRODUCTION

2. This is a civil action to recover damages, in excess of **$75,000,** plus all applicable civil penalties and other relief from Defendant, for unlawfully and intentionally retaliating against **Cross,** in violation of the anti-retaliation provisions of the False Claims Act, 31U.S.C.3730(h).

## JURIDSICTION AND VENUE

3. This Court has jurisdiction, under the Federal False Claims Act, 31U.S.C. 3732.

4. The claims in the proposed action arise from the Defendant's participation in the Medicare Insurance Program, in **Seattle**, Washington, and therefore under the applicable statues and court rules, venue is proper in the Western District of Washington, at **Seattle.**

## PARTIES

5. *Felicia Cross* is a Plaintiff, under 31U.S.C. 3730(b)(1).

6. Defendant, **Seattle Cancer Care Alliance ("SCCA")** is a Washington nonprofit corporation, with its principal offices located in **Seattle**, Washington.

7. Whenever reference is made, in this Complaint, to any representation, act, or transaction of the Defendant herein, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents, or representatives, while actively engaged in the course and scope of their employment, did authorize such acts or transactions on behalf of the Defendant. The Defendant is referred to hereinafter as "**SCCA.**"

## FACTS

8. **Felicia Cross,** worked for 13 ½ years at the University of Washington Medical Center, as the Lead Pharmacy Billing Specialist. She was recruited to SCCA, by UWMC senior

PLAINTIFF'S COMPLAINT- 2

management, on December 1, 2000, with full seniority, to lead the pharmacy-billing department, at the grand opening of SCCA. On October 1, 2007, she was promoted to SCCA Integrity/Compliance, to implement a newly created Clinical Research Billing Compliance Analyst position. She has worked in the field for over 33 years, with 26 of those years working for the SCCA, based on seniority. SCCA implemented EPIC Medical Electronic Medical Records and billing system, on August 1, 2010.

9. Cross started working at the newly opened SCCA, one month before the grand opening. No one had worked in either the Pharmacy or Research Billing positions, prior to Cross filling both positions. Her job was to work closely with research physicians and study staff, to perform compliant research billing audits. During the early years, she made good progress reducing compliance risk and implementing compliant procedures and policies, for clinical research.

10. The Corporate Compliance Officer (Phuong Dao), reviewed and approved audit plans, results and audit reports, prepared by Cross, from 10/2007- 10/2010, until the new Compliance Manager, was hired, on 7/1/2010, and was trained and prepared to review the audit reviews. On or about October 31, 2012, Dao left SCCA. Thereafter, it was Cross' job to report all audit findings to the Compliance Manager. Problems sometimes occur in research billing audits, because of missing, inaccurate required Institutional Review Board (IRB) approved study budgets for grant, or government funded clinical research studies, billing plans/contracts, and signed patient Informed Consents forms. Problems with Epic software/claim format, set-up problems preventing study participants (patients or insurance) from being billed and charged for services contracted and billable to the study sponsor, to be paid by the study budget/grant. When such problems arose, Cross would consult with the Compliance Manger, throughout the audit process, and she would prepare and distribute a final audit report, to the physician and

PLAINTIFF'S COMPLAINT- 3

the study staff. Cross provided the study staff with details of billing errors and recommendations on reconciliations. Also, recommendations were provided on documentation and compliance requirements for study budgets/ plans and study set up information.

11.     In addition, it was Cross' job to work closely with patient financial services, to ensure proper claims reversals and credits were applied to patient accounts/insurance. She provided study staff with detailed reports of audit findings and recommendations for corrective actions. Cross would conduct a follow up audit, to ensure audit findings were addressed and corrected.

12.     Between October 2007 and October 2013, Cross investigated and produced more than 50 audits. Ms. Pranzini reviewed, accepted, approved, and signed (approx.) six research billing audit reports, between October 2010 and October 2013, prepared by Cross.  In February 2013, Compliance Manger, Traci Pranzini, became SCCA's Corporate Compliance Officer.

13.     Between April 2012 and December 2012, Cross worked closely with Dr. John Pagel and other staff members, on a research study entitled "Trubion 016; Protocol #FH-2441." The sponsor for the study was Emergent. This was one of many studies that patients were assigned.

14.     In April 2012, Cross began investigating a patient initiated inquiry about charges billed to the patient's account and/or insurance and that were submitted to Medicare. The patient inquired about copays & deductibles that he was being charged, for services that were provided as a part his/her study. Research Coordinator Lori Jarrett, contacted Revenue Cycle Billing, Patient Finance Supervisor, and Kris Pedersen about the patient's billing concerns.

15.     On April 18, 2012, Kris Pedersen contacted, Compliance Manager, Traci Pranzini to request an audit on patient's study account. Ms. Pranzini forwarded the inquiry to Ms. Cross for initial review of the patient's account and research billable charges.

16.     On April 20, 2012, Ms. Cross e-mailed Compliance Manager, Pranzini with an initial

PLAINTIFF'S COMPLAINT- 4

review of the research billable charges, posted to the patient's account. Cross uncovered so many documentation errors that needed to be addressed and/or clarified, before she could research the actual billing discrepancies. At this time, Ms. Cross was very concerned that fraudulent conduct may had occurred. (The actual audit did not close until 12/8/2012).

17. During her investigation, Ms. Cross uncovered the following. First, the patient was being treated and billed for **study protocol #FH2441.** However, the patient had not signed consent to participate in this study. On January 12, 2012, the patient signed consent to participate in study #FH 2431; (not #2441) Dr. Pagel's documentation does not indicate the patient is on the study # that he consented to participate in. On 1/13/12, the patient was charged for a (protocol #2441 research billable) Bone Marrow Procedure. The patient was charged for this procedure only because his documentation did not indicate the correct study budget information. Therefore, the patient was charged for the procedures, as well as the study sponsor, in the budget, who paid for the procedures. Furthermore, the patient was also billed for CT Scans that should had been billable and paid by the study budget.

18. Again, after uncovering these facts, Ms. Cross formed the belief that medical fraud may have occurred and/or was on going.  In fact, due to the severity of her findings, Cross was instructed by Pranzini to review the study accounts of the other four participant on Dr. Pagel's study.  Cross uncovered serious discrepancies on all patients being "treated" in study (# 2441). Two of the five participants did not have signed consents, in their paper chart medical record, acknowledging participation in Dr. Pagel's study.

19. A second patient's account, reviewed by Ms. Cross, revealed that the patient did not sign a consent form to participate in ANY study, including Protocol #2441. However, according to Dr. Pagel's clinic notes, the patient was participating in #2441. In fact, Dr. Pagel

PLAINTIFF'S COMPLAINT- 5

references three separate studies in the patient's legal medical record as being treated on these three studies, with an additional reference to a fourth study. Based on her investigation, Ms. Cross identified Research Billing fraud, Medicare fraud, Human Protection fraud, Documentation fraud, and Double Billing fraud.

20. Ms. Cross immediately provided all of this information to Pranzini and she informed her that she was concerned that Medicare fraud had occurred. Moreover, Dr. Pagel confirmed Ms. Cross' reasonable belief that SCCA may have been systematically committing fraud, when she was told by Dr. Pagel, on or about April 25th, 2012, that he was aware of the erroneous research billing practices and non-compliant documentation. Surprisingly, the audit didn't close until Dec. 2012.

21. On May 14, 2012, Cross completed and submitted an audit report, to Pranzini, detailing the information noted above, in addition to four other study participants. Fred Hutchinson, Legal Counsel Gerianne Sands, was brought into the investigation, to minimize the impact of the non-compliant documentation implications for Dr. Pagel's study documentation and the Medicare fraud concerns.

22. From May 14, 2012 – July 27, 2012, Pranzini teamed with Revenue Cycle Compliance manger, Eve Peabody, to re-write Cross' original audit report, without Cross' input. Cross became aware of the rewrite, when Peabody asked Ms. Cross questions about her original audit report, that were out of Ms. Peabody's job scope.  It was then that Ms. Cross believed that Pranzini was attempting to cover up Medicare fraud, by rewriting Cross' original report, before distribution.

23. Thus, Pranzini distributed a "revised" audit report to study #2441 Trubion 016 to the stakeholders, on July 24, 2012.  She did not include Compliance Officer Phuong Dao in the

PLAINTIFF'S COMPLAINT- 6

"revised" audit report, nor did she make any reference to the work Ms. Cross had investigated for the "original" audit.

24. On July, 31, 2012, Dr. Pagel called Ms. Cross, in a fit of rage, regarding the audit report that Pranzini sent out. He called back with Kathleen Shannon-Dorcy on the phone. Dr. Pagel stated that the audit department had no authority to suggest that there were errors associated with his study and that, in thirteen years, no had ever looked at his documentation. Nonetheless, Dr. Pagel acknowledged many of the audit findings, including, but not limited to the fact that over $46,000.00 in research billable line items needed to be reimbursed.

25. On or about September 2, 2012 Pranzini and Cross finally met to discuss the next steps, regarding the audit. However, Pranzini appeared unconcerned with Ms. Cross' original findings and deemed the audit closed. This did not sit well with Ms. Cross.

26. Finally, after several attempts, on December 8, 2012, Ms. Cross met with CEO, Norm Hubbard, to discuss the findings associated with Dr. Pagel's audit and to discuss her concerns about Pranzini's lack of attention, to the seriousness of the documentation findings of the audit. Cross directly communicated to CEO, Norm Hubbard that SSCA had committed Medicare fraud, concerning Dr. Pagel's patient and that because of how the study was set up from the beginning, all participants may have been double billed and/or billed fraudulently.

27. Also, she informed Mr. Hubbard that she was concerned that the seriousness of Dr. Pagel's fraudulent documentation was being overlooked and not reported to the proper clinical research sponsors or government agencies (OIG, IRB).  Cross discussed the discrepancies in the documentation, concerning treatment, study protocol information in the legal medical records and multiple research related procedures, billed to the patient and billed and paid by the study budget, sponsor that were never properly addressed, reported and/or reconciled.

28. Furthermore, Dr. Pagel wasn't offered or required to participate in any additional documentation training, or consequences, for not adhering to the research billing and documentation guidelines. Dr. Pagel was allowed to continue with the questionable research results, in order to validate the government funding for the Trubion- 016 study. This was done without signed informed consent forms, from "participating" study participants. This resulted in double billing to the patients and the study budget agreement, and serious lack of documentation, to support the results of the study.

29. After not receiving any follow up response from CEO Hubbard nor Ms. Pranzini, Cross' concerns regarding Medical fraud intensified. She was convinced that SCCA and Dr. Pagel conducted unsupported research studies, double billed patients for services and procedures budgeted and paid by the study agreement, and that their conduct violated many of the governments required research auditing, documentation and billing requirements. Furthermore, Ms. Cross was concerned that unsupported research findings invalidated the actual study findings for FDA approval of the study drug; promoted the patient to maximum allowable insurance benefits, co-pays, co-insurance, out of pocket cost and collections for services and procedures billable to the study.

30. Moreover, Cross' Medicare fraud concerns were confirmed, in the following months, when she was removed or not included in her regular daily job functions. She was inexplicably required to directly report to Eve Peabody, instead of Pranzini. This was most peculiar because Peabody had no research auditing training or experience. In addition, her work environment and relationship with Ms. Pranzini began to turn. Ms. Cross believes that Ms. Pranzini was retaliating against her for going above her head and talking to CEO Hubbard.

31. In January 2013, Ms. Cross had another conversation with CEO Hubbard. Rather than

explaining how Cross' identified concerns, regarding the audit, were corrected, Mr. Hubbard asked Ms. Cross "if she stood behind her findings." Ms. Cross said "yes" and Mr. Hubbard responded: "that's all I need to know." Shortly thereafter, Ms. Cross was required to unofficially report to Eve Peabody, on all future audit findings. In June 2013, Ms. Cross was officially instructed by Pranzini to start reporting only to Ms. Peabody and Ms. Cross was excluded from all audit discussions.

32. Pranzini and SCCA's retaliatory conduct ultimately required Ms. Cross to seek medical treatment and to take time off from work. Only after several months off of work did Ms. Cross medical providers clear her to return to work.

33. Finally, on October 1, 2013, after Peabody had walked pass Cross' desk, for over 2 weeks, without acknowledging her, at all, Ms. Cross was asked to meet with her after work. When Ms. Cross showed up for the meeting, Ms. Peabody was accompanied by Human Resources Representative Jon Flowers, whom Ms. Cross had conferred with, over the past year, concerning the Pagel audit and the change in her work environment since the audit findings had been reported.

34. At this meeting, Peabody informed Cross that "the decision had been made to terminate her, effective immediately", When Cross asked for the reason, Peabody stated "Washington is an at-will state, and she did not have to give her a reason." Simultaneously, HR Rep. Flowers, slid a red folder across the table and advised Cross to read and sign the document enclosed.

35. At the meeting, Mr. Flowers also informed Ms. Cross that because of "how valued she was to the organization that all senior administrations had to sign off on the termination" and they offered her approximately $43,000.00 to resign. Ms. Cross was instructed that if she signed the separation letter, then her unemployment would be granted. Mr. Cross did not sign

the document.

36. Ms. Cross believes that SCCA's actions were in violation of their "Open door, no retaliation" compliance policy. Ms. Cross, on information and belief, believes that her investigation uncovered SCCA practices that promoted non-compliance of research studies and physician's practices and SCCA failed to educate or report documentation and/or breeched it study sponsor's grants/budgets and/or agreements, per OIG, IRB and government requirements. Ms. Cross believes that this is a practice that began many years ago and has affected the outcome of several documented audits. If so, then Medicare has been falsely up charged for many years. A fact that an internal investigation by SCCA would have revealed. Moreover, on information and belief,

37. Thus, on October 1, 2013, as a direct result of Cross' investigation, she was terminated, after 26yrs of loyal, dedicated service, and the implementation of two departments, (Pharmacy and Compliance), at SCCA. Cross documented and reported all of the findings of the audit investigation, according to compliance guidelines and the way former Compliance Officer Dao had trained and instructed her to, prior to his departure and before Pranzini was employed at SCCA and promoted from Compliance Manager to Compliance Officer. Accordingly, Cross believes she was fired for exposing Medicare fraud and non-compliance results, of the clinical research study, conducted by Dr. Pagel.

38. Cross believes she was fired without explanation, and denied any access to the results of the audit investigation, in order to wall her off from hard information about the nature and extent of the false billing and to keep her silent. At the time of her termination, SCCA tried to buy her silence. She was presented with a draft settlement agreement, which provided that, in return for SCCA paying her $43,000.00, Cross would give SCCA a full release of all claims;

PLAINTIFF'S COMPLAINT- 10

promise to keep confidential any information she had about SCCA (including its billing practices, policies, and procedures). In addition, SCCA would agree to not oppose unemployment compensation, even though the settlement called for her to "mutually separate." In short, Ms. Cross believes the proposed Settlement Agreement was an attempt to silence her, regarding her knowledge of SCCA's Medicare fraud and she believes the offer was an admission that they had something very serious to hide.

### THE ACTIONABLE CONDUCT OF THE DEFENDANTS

39. For a period of more than thirteen years, prior to April, 2012, Defendant acted knowingly, or in reckless disregard or in deliberate ignorance of the truth, in presenting or causing to be presented to the United States false claims, for payment of Medicare reimbursements, referenced above, for payment or approval, in violation of 31 U.S.C. 3729, et seq., the False Claims Act.

40. When Ms. Cross' investigation exposed SCCA's fraudulent conduct and procedures and she refused to capitulate, SCCA, with explicit notice of Cross investigative efforts, retaliated against her, by systematically excluding her from performing her job duties and eventually terminating her employment.

### CAUSES OF ACTION: COUNT I RETALIATION

41. Plaintiff alleges and incorporates by reference paragraphs 1 through 39, above, as though set forth fully herein.

42. Through investigation and fact gathering, Cross formed a good faith belief that SCCA may have been committing Medicare fraud and she reported this information to her supervisors. Cross' belief was a belief that an employee in the same or similar circumstance would have held. In retaliation for her investigative conduct and for refusing to dismiss her

PLAINTIFF'S COMPLAINT- 11

findings, the Defendant systematically removed Ms. Cross from her audit and shielded her from fraudulent clinical study procedures and policies, which allowed for up charging claims for Medicare reimbursement, in such a way that it would defraud the United States.

43.  By this conduct, the Defendant retaliated against Cross and wrongfully terminated her, in violation of their own policies, Washington and Federal law, and the anti-retaliation provisions of the False Claims Act, 31 U.S.C. 3730(h).  As a result of Defendant's conduct, Plaintiff has been damaged, in an amount to be proven, at the time of trial.

### COUNT II WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

44.  Plaintiff alleges and incorporates by reference paragraphs 1 through 43, above, as though set forth fully herein.

45.  By this conduct, the Defendant retaliated against Cross and wrongfully terminated her in violation of the public policies mandated in both Washington and Federal laws to protect whistleblowers.  As a result of Defendant's conduct, Plaintiff has been damaged, in amount to be proven, at the time of trial.

### COUNT III UNPAID WAGES AND WILLFULLY WITHHELD WAGES
### (RCW CHAPTERS 49.48 AND 49.52)

46.  Plaintiff incorporates all prior allegations made in this Complaint. By wrongfully terminating Cross, Defendant willfully and with intent withheld wages from Plaintiff that it was obligated to pay.  Defendant violated Washington's wage and hour laws, RCW Chapters 49.48 and 49.52.  Pursuant to 49.52.70, Defendant owes Plaintiff double damages and Defendant is responsible for attorney fees and costs.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands that judgment be entered in favor of the Plaintiff and

against the Defendant as follows:

47. Plaintiff demands damages in an amount to be proven at the time of trial, including reinstatement, with the same seniority status that Cross would have had, but for the retaliation (or front pay in the alternative), two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained, as a result of the retaliation, including litigation costs and reasonable attorneys' fees, plus pre-judgment interest, at the highest rate, allowed by law. Further, the Plaintiff demands such other and further relief, as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

48. Pursuant to Rule 38, of the Federal Rules of Civil Procedure, the Plaintiff demands trial by jury, in this action, of all issues so triable.

RESPECTFULLY SUBMITTED this 29th day of May, 2016.

**FULTON LAW PLLC**

By: ___/s/ Robert Fulton_____
Robert Fulton, WSBA No. 29277
robert@fultonlawpllc.com
601 Union St., Suite 4200, Seattle, WA 98101
Telephone:  206.652.3260
Attorney for Plaintiff Felicia Cross

**The Law Office of Oscar Desper**
odesper@gmail.com
601 Union St., Suite 4200, Seattle, WA 98101
Telephone: 206.652.3385
Attorney for Plaintiff Felicia Cross